## CONNOR LUMBER & LAND CO. v. UNITED STATES.

### No. 1775.

United States District Court
W. D. Wisconsin.

Jan. 19, 1949.

Brazeau & Graves and R. B. Graves, all of Wisconsin Rapids, Wis., for plaintiff.

Theron Lamar Caudle, Asst. Atty. Gen., Andrew D. Sharpe and Fred J. Neuland, Sp. Assts. to the Atty. Gen., and Charles H. Cashin, U. S. Atty., of Madison, Wis., for defendant.

STONE, District Judge.

In this action plaintiff seeks to recover from the defendant, an alleged overpayment of a surtax in the sum of $23,311.59, with interest, on undistributed profits for the year 1937.

All facts have been stipulated and this Court adopts the stipulation as its findings of fact.

Plaintiff's claim for refund was properly filed and officially disallowed by the Commissioner of Internal Revenue on April 9, 1946.

The material facts, as stipulated by the parties, are as follows:

Plaintiff is now and was at all times mentioned in the complaint, a Wisconsin corporation with offices at Marshfield, Wisconsin, and engaged in logging operations upon timber lands owned by it and in the manufacture of lumber and lumber products at its sawmill located at Laona, Wisconsin.

In the year 1932 plaintiff, unable to pay its indebtedness, defaulted in the payment of interest on its outstanding mortgage indebtedness. Pursuant to the terms of the mortgage and trust deed securing that indebtedness, the trustee thereunder declared the entire amount of plaintiff's outstanding bonds, amounting to the principal sum of $861,000, and accrued interest, to be immediately due and payable. Thereupon, the trustees under the trust deed threatened and assumed to take possession of all of the property and assets of plaintiff described in the trust deed as security for its bonded indebtedness. Thereafter, through negotiation with the creditors' committee, representing the holders of the outstanding mortgage bonds, and all unsecured creditors of the company, creditors' agreements were entered into in writing on September 2, 1932, under which agreements all control of the assets and management of plaintiff was surrendered by the stockholders to representatives of its secured and unsecured creditors.

The agreement between plaintiff and its bondholders' protective committee, among other things, provided in part:

(1) That on or before May 1, 1937, plaintiff was obligated to pay not less than $400,000 to the mortgage trustees on the principal of the bonds and one-half of the unpaid interest on the bonds for the period from November 1, 1931 to May 1, 1934. On or before May 1, 1938, plaintiff was to make payments to the mortgage trustees of the balance of the interest remaining unpaid for the period prior to May 1, 1934, and an additional payment of not less than $75,000 on the principal of the bonds. Thereafter, plaintiff was to make principal payments to the mortgage trustees on the principal in the amount of not less than $75,000 each year commencing with the year ending May 1, 1939, and continuing until all the bonds were paid in full. Except to the extent of the defaults provided to be remedied by the foregoing, plaintiff was required to comply with all of the other terms and conditions of the trust indenture of October 15, 1926.

(2) The directors of plaintiff were required to execute and deliver their resignations to the trustees named in the agreement immediately upon the appointment of the trustees, with authority in such trustees to deliver such resignations to plaintiff at any time as the trustees in their discretion should determine, such resignations to become effective immediately upon their delivery to plaintiff by the trustees.

(3) Plaintiff was required to enter into an agreement with its general creditors for an extension of time for payment of their claims. It was also required to enter into an agreement with R. Connor Company, another of its creditors, whereby plaintiff's indebtedness to that company was subordinated to the mortgage bonds and certain other indebtedness.

(4) Within 10 days from the date of the agreement, the holders of not less than 79 per cent of plaintiff's outstanding common stock were required to become parties to the agreement by endorsing their stock in blank and delivering it to the trustees named in the agreement, and the trustees were authorized to transfer the stock on the books of plaintiff to their joint names, as trustees.

(5) The protective committee agreed that it would refrain from making demand upon the trustees for foreclosure of the trust indenture so long as plaintiff, its officers, directors, and stockholders complied with the terms, provisions and conditions of the agreement.

(6) The trustees were the legal owners of record of plaintiff's stock and, as such, were entitled to and could exercise any and all voting rights and such other rights with respect thereto as were vested in them by the agreement, including all such control over the affairs, property, and management as could be exercised by stockholders of plaintiff, except the power to sell substantially all of plaintiff's property before default by it.

(7) If at any time during the life of the agreement proceedings should be instituted for the appointment of a receiver for plaintiff or judgment should be entered against it or other legal action taken in respect to it, which in the opinion of the committee made it necessary or advisable for the committee to terminate the agreement, it was authorized to do so, and upon its termination plaintiff's stock was to be transferred to it for the benefit of the deposited bonds.

(8) The agreement was to remain in effect until terminated by action of the committee as therein provided or until plaintiff had complied with the provisions of the agreement and had remedied all defaults upon the trust indenture securing the bonds. Upon termination of the agreement, plaintiff's stock was to be returned to its stockholders.

Immediately after the execution of the agreement and in pursuance of the terms and requirements thereof, all of the stockholders of plaintiff assigned and transferred plaintiff's outstanding stock, together with all voting rights thereon to the three named trustees selected by the creditors' committee in pursuance of the provisions of the agreement. Thereafter, all assets and property of the company and

the conduct of its business were under the control of the trustees so selected and all voting rights were exercised by them until subsequent to the year 1937.

The undivided profit of plaintiff for the taxable year 1937, as shown by its books of account, was $56,488.27. During that year there was paid out of plaintiff's net earnings and from amounts realized from the conversion of capital assets during 1937 indebtedness then due and payable and accrued prior to May 1, 1936, including interest, the aggregate sum of $253,474.25.

On or about March 15, 1938, plaintiff filed its corporation income and excess profits tax return for the calendar year 1937 with the Collector of Internal Revenue at Milwaukee, Wisconsin, which return disclosed an undistributed profits surtax in the amount of $10,745.83, which surtax was paid in equal quarterly installments during the year 1938. No credit for contracts restricting dividend payments was claimed by plaintiff in its return filed for the calendar year 1937.

Thereafter, the Commissioner determined the adjusted net taxable income and the undistributed net income for the year 1937 to be $113,715.08, and determined the total surtax on undistributed profits for that year to be $23,311.59, or a deficiency surtax of $12,565.76, which deficiency was assessed against and thereafter paid by plaintiff, with accrued interest, on June 30, 1939.

On July 31, 1940, plaintiff filed its claim in the amount of $23,311.59 for the refund of the undistributed profits surtax paid by it for the year 1937, which claim was based upon the contention that the agreement entered into on September 2, 1932, as aforesaid, contained provisions expressly dealing with the disposition of earnings or profits for the year 1937, and satisfied the statutory requirements which entitled it to a credit under the provisions of Section 26(c) of the Revenue Act of 1936, 26 U.S.C.A. Int.Rev.Acts, page 836, in determining its liability for surtax on undistributed profits, as described by Section 14(b) of that Act, 26 U.S.C.A.Int.Rev. Acts, page 823.

On April 9, 1946, the Commissioner of Internal Revenue officially disallowed plaintiff's claim for refund.

The trust indenture and the creditors' agreement were both executed prior to May 1, 1936. They provided for the payment, out of the corporation's 1937 income, (which included all earnings of the company for that year) of the company's debts incurred prior to May 1, 1936.

The trust deed provides that upon default in the payment of any of the principal and interest of the mortgage indebtedness, representatives of the creditors may take possession of all property covered by the mortgage and operate the mortgagor's business as fully as the mortgagor might do; to collect and receive all "rent, issues, income and profits from the mortgaged property", and apply all funds coming into their hands in payment of operating expenses and in discharge of outstanding indebtedness in the order stated in the trust deed.

The creditors' agreement was supplemental to the trust indenture. It in no way modified or waived any of the provisions of the trust agreement.

The creditors' trustees operating the company in 1937 were, by the terms of the trust agreement, required to apply all funds coming into their hands, which included earnings, in payment of the company's expenses and its outstanding indebtedness.

The agreement does not refer to any specific year as required by the Revenue Act in question, but it did expressly provide, by the provisions of the creditors' agreement, that payment shall be made in 1937 out of the income.

Section 14 of the Revenue Act of 1936 imposes a surtax upon the "undistributed net income". Undistributed net income was defined to be the net taxable income less the following amounts: The normal income tax for the current year, and all amounts distributed by way of dividends. Additional credits were allowed by Section 26 of the Act for the following amounts:

(1) The amount of undistributed net income which the corporation was prohibited from distributing as dividends by the terms

of a written contract executed by the corporation prior to May 1, 1936, and

(2) All amounts which were required to be paid or set aside out of earnings and profits of the taxable year for the discharge of its debts.

Section 14 of the Revenue Act of 1936, c. 690, 49 Stat. 1648, provides in part as follows:

"Sec. 14. Surtax on Undistributed Profits

"(a) Definitions. As used in this title—

"(1) The term 'adjusted net income' means the net income minus the sum of—

"(A) The normal tax imposed by section 13.

&ast; &ast; &ast; &ast; &ast; &ast;

"(2) The term 'undistributed net income' means the adjusted net income minus the sum of the dividends paid credit provided in section 27 and the credit provided in section 26(c), relating to contracts restricting dividends.

"(b) Imposition of Tax. There shall be levied, collected, and paid for each taxable year upon the net income of every corporation a surtax equal to the sum of the following, subject to the application of the specific credit as provided in subsection (c): * * *"

Section 26 of the Revenue Act of 1936, provides in part as follows:

"Sec. 26. Credits of Corporations.

"In the case of a corporation the following credits shall be allowed to the extent provided in the various sections imposing tax—

&ast; &ast; &ast; &ast; &ast; &ast;

"(c) Contracts Restricting Payment of Dividends.

"(1) Prohibition on payment of dividends. An amount equal to the excess of the adjusted net income over the aggregate of the amounts which can be distributed within the taxable year as dividends without violating a provision of a written contract executed by the corporation prior to May 1, 1936, which provision expressly deals with the payment of dividends. If a corporation would be entitled to a credit under this paragraph because of a contract provision and also to one or more credits because of other contract provisions, only the largest of such credits shall be allowed, and for such purpose if two or more credits are equal in amount only one shall be taken into account.

"(2) Disposition of profits of taxable year. An amount equal to the portion of the earnings and profits of the taxable year which is required (by a provision of a written contract executed by the corporation prior to May 1, 1936, which provision expressly deals with the disposition of earnings and profits of the taxable year) to be paid within the taxable year in discharge of a debt, or to be irrevocably set aside within the taxable year for the discharge of a debt; to the extent that such amount has been so paid or set aside. For the purposes of this paragraph, a requirement to pay or set aside an amount equal to a percentage of earnings and profits shall be considered a requirement to pay or set aside such percentage of earnings and profits. As used in this paragraph, the word 'debt' does not include a debt incurred after April 30, 1936.

"(3) Double credit not allowed. If both paragraph (1) and paragraph (2) apply, the one of such paragraphs which allows the greater credit shall be applied; and, if the credit allowable under each paragraph is the same, only one of such paragraphs shall be applied. * * *".

The contract contained no express provision prohibiting the payment of dividends in 1937. Therefore, the only issue for determination here is whether plaintiff is entitled to credit provided in Section 26(c) (2) of the Revenue Act of 1936 for the amounts it was required to pay or set out of earnings and profits of the taxable year for the discharge of its debts.

Plaintiff contends that it had no income in 1937 derived from its 1937 operations that was available for distribution as dividends for the reason that the corporation was required, by the terms of the creditors' agreements, to pay out of its income for that year, first, the operating expenses, and then apply the balance of the income

toward the discharge of its existing indebtedness. All of its net income for 1937 was so expended.

The defendant contends that the agreement of September 2, 1932, between plaintiff and the bondholders' protective committee and its other creditors, does not satisfy the provisions of Section 26(c) (1) and (2) of the Act, in that there are no provisions in the agreement which expressly prohibits or deals with the payment of dividends within the taxable year of 1937, or that expressly deals with the disposition of earnings and profits of the taxable year, making said earnings and profits subject to the payment of the company's debts during that year.

Section 26(c) (2) of the Act provides for a credit of an amount equal to the portion of the earnings and profits of the taxable year which is required by a provision of a written contract executed prior to May 1, 1936, which provision expressly deals with the disposition of earnings and profits of the taxable year to be paid within that year in discharge of a debt and then only to the extent that such amount has been so paid or set aside.

To satisfy the terms of this statute and before credit may be taken by plaintiff it must appear that a written contract was entered into by plaintiff prior to May 1, 1936, which expressly deals with the disposition of earnings and profits of the taxable year.

The separate contract with the unsecured creditors specifically required payment to be made in 1937 on the unsecured indebtedness as follows: "The principal shall be payable on or before May 1, 1937 (without further payment of interest until May 1, 1937) and from and after May 1, 1934 the company shall resume payments of interest semi-annually in the amount not to exceed 6% per annum; provided however, that upon the maturity of the principal on May 1, 1937 the company shall pay to the unsecured creditors all arrears of interest on said principal, including interest unpaid for the period to May 1, 1934".

The trust deed, which was executed prior to May 1, 1936, contained no provision restricting dividends. It did, however, provide that the earnings should be used during the taxable year of 1937 for the payment of the company's debts. That portion of the trust deed reads as follows: "On or before May 1, 1937, the lumber co. shall make payments of not less than $400,000.00 to the mortgage trustees for application on the principal of the bonds and shall pay one-half of the unpaid interest on the bonds from November 1, 1931 to May 1, 1934".

The trust deed, as stated, provided that in the event of default the trustees could operate the business, "collect and receive all rents, issues, income and profits" from the mortgaged property, and apply all funds coming into their hands as follows:

(a-1) First, to paying all expenses, taxes, etc.;

(a-2) * * * to paying all principal and interest then in default;

(a-3) * * * to paying all other debts;

(a-4) The balance, if any, be paid to the mortgagor, or its order.

This agreement obligated the trustees to apply the income toward the payment of debts in 1937, as well as other years. It fixed the minimum amount to be paid on the principal of the bonds on or before May 1, 1937 at not less than $400,000, plus one-half of the unpaid interest on the bonds for the period from November 1, 1931 to May 1, 1934.

In 1937 the trustees paid out of the earnings and profits, and from the proceeds of the capital assets, $86,000 of bond principal and $93,124.50 of bond interest.

Pursuant to the terms of the creditors' agreement there was paid in 1937, on the unsecured indebtedness, $74,349.75.

The total payments made by the trustees on the company's indebtedness in that year, pursuant to its obligations under the said contracts amounted to $253,474.25, all of which had accrued prior to May 1, 1936, and paid out of the income for 1937, which included its earnings for that year.

All of the stock issued by the company to its stockholders had been assigned to the trustees, and the officers of the com-

pany had filed their resignations with the trustees. The trustees held the voting rights of the corporate stock for the benefit of all creditors. There were no stockholders entitled to demand or receive any dividends. The trustees could make no other disposition of the funds coming into their hands other than to apply it upon the operating expenses and the indebtedness of the company, as provided in the contract.

The cases cited by defendant in its brief and during the oral argument are readily distinguishable from the facts in this case.

In Helvering v. Northwest Steel Rolling Mills, 311 U.S. 46, 61 S.Ct. 109, 85 L.Ed. 29, there was no written contract dealing with the subject of dividends or the distribution of profits. The taxpayer contended that the corporate charter in effect was a contract. The Court held that the corporate charter did not qualify as a contract within the meaning of the statute.

In Bell-Vue Manufacturing Co. v. Commissioner, 43 B.T.A. 12, the trustees representing the creditors were, by the terms of the creditors' agreement, vested with the right to vote the stock, and with the discretion to declare and pay dividends to the original stockholders. The decision of the Board of Tax Appeals, sustaining the assessment, was based on the fact that the creditors' agreement did not satisfy the statute in that it did not forbid distribution of earnings and profits by way of dividends.

In the case of Helvering v. Ohio Leather Co., 317 U.S. 102, 63 S.Ct. 103, 107, 87 L. Ed. 113, the contract did not provide for any payment on the indebtedness within a taxable year. As stated in the opinion, "The only requirement is that taxpayers pay on or before a date after the close of the taxable year."

In Moloney Electric Co. v. Commissioner, 42 B.T.A. 78, the Court held that the contract did not meet the requirements of the statute for the reason that the amount of earnings upon which the 20% payment was to be computed was to be determined as expressly provided by the contract after the close of each calendar year. The Court said, "Under the terms of the taxpayer's contract, however, it is clear that the payment or setting aside of 20% of the 1936 excess earnings was not required until 1937, the year following the taxable year."

Under the terms of the agreements in this action the trustees, who were operating the company in 1937, were, by the terms of the trust indenture, required to apply all funds coming into their hands in payment of expenses and outstanding indebtedness.

The creditors' agreement expressly provided that the payment on the indebtedness must be paid in the year 1937.

The specific conditions of the statute were complied with by the plaintiff. First, the contract was in writing and was executed by the corporation prior to May 1, 1936. Secondly, it contained a provision dealing with the disposition of a portion of the earnings and profits of a taxable year to be paid within the taxable year in discharge of its indebtedness.

The plaintiff is entitled to a credit to the extent of the amount which was paid in 1937 on its indebtedness, and for judgment as prayed for in the complaint.